The next case is Kent Kean v. Jack Henry & Associates. Kent Kean is, of course, appealing discovery rulings and the grant of a summary judgment. The first issue related to the discovery ruling was the refusal to review in camera a key email that had been redacted. The defendant simply made the averment that it was not relevant, did not assert a privilege, and did not describe the email or the subject of the email. The only evidence we have is the email itself, which has a subject heading Kent Kean. So the evidence shows that it is relevant. It's rebutted by the author, but this is what trials are about. We should be able to look at that email outright, or if not, the proper remedy or procedure would be for the judge to view that email in camera itself. Let me ask you a question. Yes. Looking at the redacted document, they said it was irrelevant. What is the relevance of the paragraph number two regarding Crystal Lindstrom? Does that have any relevance to Kent? Mr. Kean? It says reviewed points for potential B.A. management position in Scott Harvey's group. Paragraph two, under the redacted. That is not relevant. And that wasn't redacted, was it? No, but yes, that's true. That's not relevant because that's under section two. Everything under section one is what's relevant. So we're looking. I was just trying to evaluate the explanation of relevance, and then when I reviewed the document, I thought maybe I was missing something, if this is relevant. But if it's not relevant, then that answers my question. I don't think that's relevant as far as I know. I'll ask opposing counsel when it's his turn. They offered it in camera, and the magistrate just said, no, I'd rather have the short circuit process instead. That's right. And did you then clearly object to that? I clearly objected to that with the district judge, and the judge just affirmed. There's really no way without access to this you can show whether it substantially prejudiced your client. Is that your position? That's exactly right. We don't have an argument for appeal. There's no privilege claim. There's no subject. We don't know what it says. This was a compromise on our behalf because we think we should be able to see the actual document. So in the conference over the motion to compel, we said, I'll tell you what, we'll compromise. Just show it to the judge. They actually agreed. The judge then said, no, I'll just take your word for it. That was the whole point. We didn't want to take their word for what it said, and we should not have to take their word for it. Part of their argument and response is, and you probably have a different view of it, but would be if you look at the rest of the structure, the remaining paragraphs, it's highly unlikely that there would be a completely incongruous point in the middle. But that's sort of non-falsifiable, right? No, it's not. Because the rest of the portion that we do have, of course, doesn't in any way imply animus based on age. That's right. But it doesn't have to apply animus to be relevant to whether or not something is pretext or a material fact is more probable or less probable. There are all types of sub-facts that may be probable or less probable. What's the best record citation, moving off that discovery point, to show that JHNA fired Keene because of his age? What is the best record? The best record is the circumstantial evidence itself, the McDonnell Douglas. Right, I know. But specifically in this record, where would you point to? What we would point to initially is that he was replaced by substantially younger people, and the reason given that his job was eliminated is not true. He was replaced. He was replaced by at least two, maybe three people. And so, of course, what the judge said is, no, he was not replaced. To look to see if he was replaced, you have to go back a few months to make that determination. And the judge said, we're not going to look back further than the date of termination. So we can show pretext by simply showing that he was replaced, and that's all we have to show. Now, of course, they come back and say, well, if we look back and say, yes, he was replaced, but we replaced him because of performance. And then we show, no, that's not true. It wasn't because of performance. So we've rebutted every step of the way. Why wasn't it because of performance? Well, the first person that replaced him was Aaron Blevins. Aaron Blevins reported to Kent Keene. There was no problem with any of the products that Kent Keene was overseeing with Blevins. So he just took the- He wasn't on the on-board project? No. Okay. And so they just took that, and so the best qualified person is the person who's already having control of the products and have it as a success. He was moved up. Those products were taken away from him without valid justification. And, in fact, in the record it shows that now Blevins has made a fiasco of one of the products, which never happened under Kent Keene. Then they single out this one on-board and give it to Kent Harvey. Well, Kent Harvey was, again, the younger person that reported directly to Kent Keene. They gave it to him, and what we have shown is that they admit to themselves that on-board was not a problem singular to Kent Keene. It was a problem of the whole group. They singled him out, but the boss's boss says it was a group problem. Harvey, even to this, at least at this time, has not been able to turn it around. And Kent Keene had eight other great projects, one of which was the most successful, by at least one measure, in the company and the United States, the most installed software in the United States. So it's as if someone's batting a 4.0, and they're still striking out, so we're going to remove you from the game. And remind me of the outline of the district court's ruling. As to the reassignment, the alleged discrimination as to reassignment, I didn't read your principal brief to be saying that that caused an adverse employment action itself, that your principal brief was saying, no, let's focus on the termination. And as to the termination, the district court's finding was there that it was a reduction in force altogether, correct? That's right. To get to that point, what we say is you have to look at the previous year in total. You can't take, you can't parse it out. You mustn't look at the totality of the circumstances. Your argument is it remains relevant, though, with the overall question of what the purpose was. That's right. It was a plan from the beginning, is our argument. And you can't just Okay, but therefore you are disputing legally the conclusion that there was no adverse employment action just as to the reassignments. There was no tangible adverse employment action that would have given, possibly given a rise to a cause of action until there was a termination. But yet, all of those are necessary, that past is necessary up until that point. Yes. And the problem is you can't segregate the past out from the end. You can't parse it out from that. You're pulling things together, not putting all the pieces of the puzzle together. There's also something called duration neglect, which is a reasoning error that if you, you can overemphasize the end of an episode in evaluating the whole episode. And we have to guard against that. So, in addition, there was, we have two other discovery issues that need to be resolved. One was the personnel file of his direct supervisor, Ron Moses. Ron Moses admits, and I believe Mark Forbus admits, that he had been commented upon on the onboard himself. And those personnel files would make it more probable or less probable as to whether or not that was a group problem and not something that should be singled out to Kent Key. And so, again, that was something that should have been provided. The court should have also allowed, should have allowed Kent Key to re-depose individuals based on documents. Two-thirds of the documents that the other side produced were produced within days of the discovery deadline or actually after the discovery deadline. And they were not responsive to the motion to compel. They were responsive to prior discovery requests made seven or eight months earlier. Those were then dumped on the plaintiff. And the plaintiff asked that summary judgment be denied based upon that in place of asking for sanctions. Did the district court give you some time to reply to those documents? No, sir. The court did, but still without the benefit of examining those witnesses, either in deposition or trial. And having examined the documents, did you go back and say, look at these documents, Judge, we need to examine these witnesses on this document and that document? We identified three documents that we would like to have examined the witnesses over.  They were- In general. In general. Three different emails, one related to onboard, actually two related to onboard and one related to ITOC. They're on page, I talk about on page eight of the reply brief. And you use those documents in your reply brief, right? I do. We had the benefit of using them in the response to the motion for summary judgment. We didn't have the benefit of examining witnesses over them. So what we ask is, Judge, one of the remedies you could do is just let us have our trial so we can examine them at trial. Or let us examine them in a deposition. Regardless, we think we have put forth enough evidence to defeat summary judgment. So I'll reserve the balance of my time. All right. Thank you, sir. Ms. Johnson. May it please the court, Your Honor. Allison Johnson for the appellee, Chuck Henry and Associates. Keen's attempt here to deflect the court's attention to discovery- Speak up, please. Otherwise it won't be recorded. Keen's attempt to deflect the court's attention here to discovery rather than to the lack of merits of his case is telling. Here Keen's essentially acknowledging his inability to show on the district court level a genuine issue of fact with regard to pretext and or that he was terminated, that his age was but forecast for his termination. Instead, he argues that he needs additional discovery when he's already been granted an inordinate amount of discovery for a case of this size. Indeed, this was a single- It doesn't make a lot of sense for you to go through and examine the deposed line of witnesses and then you come up late with a document. I mean, you need the documents before you go conduct examination. That's an old game and it shouldn't be allowed unless you've got some darn good reason for that, and I don't know what that would be. And, Your Honor, in this case, we had objected to the specific requests, and these documents, actually the first set that he's complaining of, so there were two sets that were produced. The first set was actually in response to a second request for production that was not served until approximately end of March or April, and the responses to those requests were served timely, and the first set of documents that he's complaining of related to those requests. With regard to the second set of documents, we had met and conferred and objected to the overbreadth of these requests, and they were very broad. They sought all emails for a period of over six, seven months between approximately seven people about various subjects. These were extremely overbroad requests, and we did meet and confer with opposing counsel about the scope of those requests, and after we were sending a letter on January 22nd, we didn't hear anything further from counsel until April 4th, and as of that day, he never demanded to, he never limited the scope of the requests in any way, and he didn't mandate that depots be postponed so we could get the- Why was it late in production if you didn't ask for them later? Why was it so late coming? Well, we ended up meeting and conferring around April 4th, and he still didn't agree to limit the requests, and ultimately, when discussing a motion to compel, we determined that we would just go ahead and produce the request, despite the fact that most of them were irrelevant documents, but it did take time to gather them because it does require electronic discovery, and I mean various people that weren't relevant here, and as you can see, he's only pointing to three of the documents out of these 4,500 documents, so our position is still that the requests were extremely overbroad and irrelevant. Let me ask you a question. In your brief, you really segment each of these personnel actions, such as reducing his workload to, well, they're not relevant because that's not an actionable in and of itself. Of course, that doesn't really answer the question of whether or not his allegation was that they undertook to get rid of him for impermissible reasons, and this was a pathway toward that conclusion. What is your answer to that? Of course, and even if you buy into Keen's theory here that some of his duties were removed as some kind of ultimate plan to make him more vulnerable for job elimination, he still does not point to any evidence that age was a factor in any of these decisions. The only thing he's pointing to here is some testimony from a coworker who he alleges is younger than one of his replacements, Michael Greenhaw, that Ron Moses can't be trusted. That has nothing to do with age, and that same coworker, Michael Greenhaw, testified. What was his age and the age of the people who replaced him? Michael Greenhaw was 47, I believe, and Clint Rader was 46. Those are the two replacing employees. As of the termination, and then Ben Moran assumed this other Vertex project that Keen was also supposed to be responsible for. I thought there was a second point, not just the setup. I thought there was an allegation also that age was specifically brought up by a supervisor. I'll address that as well. With regard to the first point, the comment about the distrust, that same coworker, Michael Greenhaw, did also testify when asked directly whether Keen was terminated because of his age. Michael Greenhaw said no, and that's on page 599 or 559 and 560 of the record. But with regard to the allegation that his age was discussed, that is Keen's only direct reference to some kind of age bias, and he admits that it's not direct evidence of age discrimination. He contends that it's circumstantial evidence of age discrimination. You know you could try this case at the time that you spent with all this paperwork. Why, this is a determined effort to terminate everything by summary judgment. You put a jury in a box, this case would go away in three days at best. If J.H. and A. had, if instead of letting him go, you had reassigned every single one of his duties so he had nothing to do, just as a matter of law, you would agree that that would be a sufficient adverse employment action? I know those aren't the facts of this case. I'm just wondering what your position is as to constructive demotions. With regard to demotions, I mean, an ultimate employment action needs to affect a person in the terms and conditions, you know, financially and the various other factors. So if someone, if all of their duties have been reassigned and they have no position. But all duties reassigned, so no prestige, no opportunity for advancement, that could. Well, if there's objective evidence, if there's objective evidence that the position is less prestigious here, there is no evidence of that. King doesn't dispute that his title didn't change, that his salary remained the same, and just reassigning some portion of his duties doesn't constitute an adverse employment action here. And going back to the mention of age, and first of all, you know, we don't necessarily contend that ever happened. Our position is that it didn't, but taking it as true for purposes of summary judgment reasons. It doesn't relate to any reassignments here, because it's undisputed that the first reassignment of which King complains in August of 2010 was the reassignment to Blevins. That was eight months before this request for age even occurred. So here, there's reassignments that are happening before this alleged comment took place, and around this same time period, this April 2011 request, if it happened, Jack Henry was contemplating another job elimination reorganization, where King's position would have been a risk or eliminated. But at that same time period, they decided not to go forward with the reorganization. I think that belies any inference of age discrimination here. If it would have been an opportune time, if that was Ron Moses' motivation to get rid of King because of his age, he just found out his age if that happened, and he didn't do so. So I think it belies any inference of age discrimination here. Let me ask you about Ron Moses' email that was redacted. The explanation was that it was irrelevant. If it was irrelevant, why was it redacted? Because it contains sensitive information unrelated to King. Well, you never said that. You never claimed privilege. I'd like you to produce the document to the court, and we'll review it in camera, because the explanation given as being irrelevant makes no sense when you consider Paragraph 2, dealing with Crystal Lindstrom and the discussion of a weekend schedule, parents' weekend. That's certainly irrelevant. So produce it to the court, please, in camera. We'll review it. Okay. Thank you. And so here King was eliminated in conjunction with the job reorganization. And in granting summary judgment for Jack Henry, the district court found that King couldn't dispute the facts in support of the termination decision. I mean, here he, as of May 2011, he was responsible for court director and Vertex and was supposed to be working on this upcoming Vertex experience project. And it's undisputed, he doesn't dispute, that he participated in a planning meeting for this Vertex experience project on September 6, 2011, that was also attended by his supervisor and Benjamin Moran, the development manager. And during this meeting, King told the supervisor, you know, I may regret saying this, but the .NET resources on the project should report to Ben Moran. And it was at that point that Ron Moses determined that if King wasn't going to manage the .NET resources on this project, then he didn't need a senior manager managing just two products with a limited number of resources beneath his responsibility. And he concurred with his supervisor. What was he told while he was being terminated? That it was a reorganization job elimination. What, they were eliminating his position? What did they tell him? That there was a job elimination reorganization, that the position was being eliminated. And did they do that? Well, there was no longer a senior manager in that role. They did distribute the duties among others. They haven't hired a new senior manager for the position. Well, I think you're saying that they didn't do that. And I don't follow your answer. They tell him, we're being terminated because we're eliminating, we're reconfiguring things, we're going to eliminate this position. My question is, it appears to the record that the only thing they did was eliminate him. Is that the reorganization you're talking about? Right, and the duties were distributed to other people in the department? Why can't I draw an inference from that that something's afoot here for sure? If you lie or mistake to the employee while you're terminating him, that's an inference, an adverse inference. And what he says is, look at my age and your sense of performance, a slack-off in performance. Are we getting close here to something that ought to have been tried to a jury? Well, and this goes back to Keane's conspiracy theory that something's afoot. Here, he's alleging, even in his papers, he mentions this on-board— He had a prima facie case established, didn't he? He did, he did. We start off with a prima facie case, and we also have essentially a concession that they misstated to him the reasons for his termination. Why isn't that enough to at least let the jury decide whether their discrimination was age or not? Well, under Gross, the standard, he's required to show that his age was the but-for cause of his termination, and he can't show any correlation between age and any of the decisions that were made during his employment. He admits there's been earlier reorganizations at Jack Henry. No one testified. None of the nine people that he deposed ever indicated that they had heard any comments about age or discussion about age. He admits he received favorable performance evaluations. Why would you tell him the truth while you're terminating him? Why don't you just tell him your job is being eliminated when he knows you're not going to do that? You don't offer an explanation that there was later a decision made not to do it. I mean you get these people talking back and forth to each other. You have documents that are redacted that aren't given to them about what they said, and then you can him, and then what happens is you don't do what you said you were going to do. You don't replace him for that reason. So you've lied about why you want to do it. That's pretty – somebody with a prima facie case, that's pretty tough stuff for summary judgments, isn't it, just to dismiss him on paper? You're looking quizzical. Do you agree that the reason given was not a true reason? I do not. And I think in a similar case, Hork v. Glazer's wholesale drug that the Fifth Circuit affirmed summary judgment for the defendant on, in that case the plaintiff had questioned whether his job was eliminated because the duties were distributed to other people. But in that case it was determined it's improper second-guessing of the company's decision to – the merits of the company's decision. In that case if they told the employee we're going to – you're being terminated because we are reorganizing and eliminating your position, I thought that case the guy was just saying that he first said that's what they did and then they didn't do it. In other words, he wasn't the source of the statement about their intentions. I mean he was the source of their intention itself, not the employee. Here the people told him affirmatively why we're going to – why you're being terminated and it wasn't true. But I disagree that it wasn't true. What's the best record site for what the reason was for the termination? And was the reason that they were eliminating this senior management position? Yes. The position he was holding. And that was not refilled, was it? That position was not refilled. It was not. So what's the – 181, 217, 376 or 548 discuss the distribution of duties and – Okay. And I have some other citations for the – whenever he determined the time that he – when Moses determined that the position was no longer necessary. And that's 180, 205 or 276. Part of the difficulty here is trying to align the party presentations and the district court's bifurcation of issues because you're standing by the district court's conclusion that the adverse employment action taken was the reorganization. And that is not implicating or questioning Keene's performance. Is that correct? Correct. Okay. So this decision was not based on the struggles with onboard? Correct. Okay. And Keene acknowledged in his response to the summary judgment motion that performance was not a factor in the termination decision. And with regard to the discovery to its within the court's discretion, the court's long recognized here that a plaintiff's entitlement to discovery prior to a motion for summary judgment ruling is not unlimited and can be cut off when the district court feels that the record has shown that no – the requested discovery is not likely to produce the facts needed by the plaintiff to withstand a motion for summary judgment. And I think here the district court, based on the record before it, felt that the facts – none of the requested discovery that was sought by Keene, which was never specifically identified. Here he spoke about redeposing all nine witnesses. When he mentions three documents, he never specifically told the district court that he wanted to redepose them just about those documents. He didn't identify any specific people within the nine that he wanted to depose. Also, of the nine witnesses that he deposed, seven were non-management employees, and he could have contacted them himself to discuss the documents if he wanted to, and he never did. The district court gave him two extensions to respond to the summary judgment motion, and that would have been within its discretion under 56D. It is just sort of a bleak reorganization of eliminating one spot. It – you know, the record does appear, even if there's very little, as you contend, relating to age, it does seem that Keene was a superb performing as to many projects, and then even the expression that's being used against him seemed to have some candor from a man who says, well, you don't need me on this last project. So just stating that, that there's a discomfort in the record, whether I see it as age-related or not, it seems like the company eliminates one position, one man who had performed superbly, and then uses against him his remark that this project should be assigned to somebody else. Not age-related, I'm just making a statement. Right, but here Keene has not, other than producing his own self-serving affidavit, he doesn't have any corroborating evidence that his employment was superb, and indeed he testified that he performed as good as or better than his peers. So whether he now submits a self-serving affidavit later on to try to justify what's happened, it doesn't show that he was a superior performer before. What about the comment, though, that is it disputed that he was in charge of one particular program that was the Nationwide's bestseller? You heard the remark made by opposing counsel. That's nowhere in the record. It's nowhere in the record that I've seen that's corroborated that statement. Regardless, OnBoard was a large project, and it's not disputed that it has problems. Not OnBoard. I think he was pointing to a different project that he might have been the manager of that was exceptional. Correct, but I don't dispute that Vertex might have been a good project, and I think that may be what he's talking about. But with regard to OnBoard, Keene didn't dispute that the project had delays. Keene didn't dispute that the project was delayed for years. Was it Harvey who was the next person who took over OnBoard? Harvey was the next person to take over OnBoard. Did he have milestone problems also? Harvey was able to effectuate changes in the product and make a noticeable difference, and that's reflected in the record as well. He was able to coach his subordinate, Michelle Cornell. He made changes and suggestions in a plan that Moses felt were markedly different than Keene. Michelle Cornell herself testified that Keene was the right person for the project, that he was a good manager. Essentially, the record shows that once Harvey took over, there were positive changes made to OnBoard, and while Keene tries to deflect his responsibility for any responsibility he may have had for OnBoard problems, even if there was some nefarious motive here related to OnBoard and Moses trying to hold him responsible for OnBoard, that doesn't belie any kind of discriminatory animus. All right, thank you. If you could file the unredacted email by 5 o'clock Wednesday, file it under seal in camera for the court. Thank you, Your Honor. With the clerk of court. All right, Mr. Sanford. Yes, Your Honor. Just briefly, the ages. Aaron Blevins initially replaced him earlier. We don't say it's an actionable lawsuit adverse action. It is an adverse action. It's not a tangible adverse action because he still had his title and he still had income, but they made Aaron Blevins, 35, equal to, they made him senior development, and they created a position where he had nine projects. Now he has only six or seven. They created an additional position then, management position at that time. Then Scott Harvey, 42, they create a second additional position, which all of those products had been under Kent Keene. Now they have three positions where Kent Keene had done all three. Were they senior management positions? Yes. He's a senior development manager. Blevins and Harvey report directly to Kent Keene, who's a senior development manager, their development managers. They promote both of them equal, take their responsibilities, move them up, bring other managers up into their positions, create three management levels where Keene held one. Were they senior management? Yes. All three senior development managers. Then he's left with, then they bring up a 32-year-old, Ben Moran, for another project and say, okay, you vote. Take me back to the statement by Moses regarding age. What happened and what did Moses ask him and what were the circumstances? The circumstances were he just walked in his office and said, what is your age? And that's it, nothing more. We can't say that's direct evidence of age discrimination, and we're not going to say that. I just want to know what was said. That was it. Just walked in in April. That was in April, and he was terminated in September. So that's what happened. But that preceded the various transfers. It was in the middle. It was, I think, after Blevins but before Scott Harvey and then before the termination. Why wouldn't his age be reflected on his personnel records? It would be. And, in fact, we're not relying on that statement except that it's relevant. We're relying on Reeves. Well, you ought to be relying on that statement. Yes, I am relying on it. Yes, I'm relying on the statement. Yes, Your Honor. We rely on all the facts. But I say that because the law says even under but-for, but-for would be a necessary but not a sufficient standard. If we show the pre-tech, if we show, if we can show the I'm out of time. You can finish it. You got it. That concludes our docket for today. We will be at recess.